UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.

OCTAVIUS WENTLAND

Case No. 3:24-CR-54-CCB-SJF

**OPINION AND ORDER**

On August 14, 2024, Defendant Octavius Wentland was indicted for unlawful possession of a machinegun in violation of 18 U.S.C. § 922(o). A jury found Mr. Wentland guilty of the charge after a trial on February 3–4, 2026.

At trial, the Court denied Mr. Wentland's motion for acquittal under Federal Rule of Criminal Procedure 29 and deferred ruling on Mr. Wentland's motion for mistrial pending post-trial briefing consistent with Federal Rule of Criminal Procedure 33. Mr. Wentland has now renewed his Rule 29 motion and fully briefed a motion for a new trial under Federal Rules of Criminal Procedure 16 and 33 on grounds that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963) and denied him a fair trial.

Based on the applicable law, facts, and argument, Mr. Wentland's post-trial motions (ECF 109) will be denied.

## I.    RELEVANT BACKGROUND

### A.    Offense Conduct

On February 13, 2024, South Bend Police had been alerted to a Jeep reportedly involved in suspicious activity. An officer located a Jeep that appeared to match the

description parked on the side of a residential street. When the officer approached the vehicle, Defendant Octavius Wentland exited the driver's door then stood near the front of the vehicle talking with the officer. At the same time, a second officer arrived on the scene and approached the passenger's seat of the vehicle. The juvenile occupant of the front passenger's seat got out of the vehicle and answered the second officer's questions. The second officer noticed a Glock pistol with a machinegun conversion device ("MCD" or "switch") attached in the passenger's door panel. The second officer then told the other officers at the scene to detain both Mr. Wentland and the juvenile. Mr. Wentland and the juvenile both fled on foot. Officers followed, and Mr. Wentland was apprehended.

Police returned to the Jeep and secured a search warrant that was executed by a third police officer. During the search, two firearms were found in the Jeep. The first was the Glock pistol in the passenger's door panel originally found by the second officer. A second Glock pistol with a switch attached was located under the driver's seat near the Jeep's back passenger area.

### B.    Pretrial Matters

Upon Mr. Wentland's indictment for unlawful possession of a machinegun, counsel was appointed to represent Mr. Wentland. On September 13, 2024, after Mr. Wentland's arraignment, the Court issued its Discovery and Scheduling Order summarizing pretrial deadlines, which included discovery disclosure deadlines for the Government within 14 days and 28 days of the Discovery Order. (ECF 12 at 1). The Court's Order also reminded the parties of their discovery obligations under Fed. R.

2

Crim. P. 16 and other duties, including, but not limited to, the Government's obligation to "disclose all material exculpatory evidence, impeachment evidence, or evidence otherwise favorable to the defendant, which arises by way of constitutional due process under *Brady v. Maryland*, 373 U.S. 83 (1963)" among other authorities. (*Id*. at 3–5).

After a final pretrial conference on May 29, 2025, Mr. Wentland's lawyer asked the Court to remove her appearance due to a breakdown in the attorney-client relationship. (ECF 27). On June 4, 2025, new counsel was appointed and entered an appearance on behalf of Mr. Wentland. (ECF 30, 31). That same day, Mr. Wentland's new lawyer asked the Government for "a complete reproduction of discovery because [she] was concerned about [her] ability to obtain discovery from Mr. Wentland's prior counsel." (ECF 109 at 27). The Government promptly produced what both the Government and defense lawyers thought was the complete discovery file related to Mr. Wentland's case. (*Id*.; ECF 82).

Just a few days later on June 9, 2025, Mr. Wentland's new lawyer made a written request to the Government for police reports and expert examinations. (ECF 109 at 27). She had reviewed the discovery produced by the Government and did not find dispatch information and a 911 call. (*Id*.). The Government promptly disclosed the missing items. Assuming the Government had disclosed all the evidence in its possession, Mr. Wentland proceeded to a two-day jury trial on February 3–4, 2026, represented by his second lawyer.

### C.    Trial

At trial, three South Bend Police Officers, Robert DeLee, Ashton Ruszkowski, and Elijah Tyler, testified about the events of February 13, 2024. Officer DeLee testified that as he approached the Jeep, Mr. Wentland exited the vehicle from the driver's side and initially remained near the front of the vehicle with him answering questions. (ECF 84 at 123–24). Body camera footage revealed that Mr. Wentland identified himself to Officer DeLee as "James Boyd" and provided a fake date of birth. (Gov. Tr. Exh. 1).

Officer Ruszkowski testified that he arrived on the scene to find Officer DeLee talking with Mr. Wentland near the front of the Jeep and then approached a juvenile in the front passenger seat of the Jeep. (ECF 84 at 141–42). Officer Ruszkowski's body cam video showed that he asked the juvenile to exit the vehicle, which he did while continuing to talk to Officer Ruszkowski. (Gov. Tr. Exh. 2). During this time, Officer Ruszkowski said he noticed a Glock handgun with a switch inside the passenger door panel. (ECF 84 at 142). Having seen the gun, Officer Ruszkowski alerted the police at the scene to detain both Mr. Wentland and the juvenile. (*Id*. at 145–46).

Mr. Wentland and the juvenile immediately fled the scene on foot chased by Officers DeLee and Ruskowski as well as others on the scene. Mr. Wentland was caught, but the juvenile got away. Officer Ruszkowski testified that he returned to the Jeep after the chase and that the Jeep had been left unattended during the chase for "[a] couple minutes, maybe." (ECF 84 at 163–64).

A search warrant was then secured that allowed for a more thorough search of the Jeep. While waiting on the warrant, Officer Elijah Tyler, a crime scene technician,

was dispatched to the scene. (*Id.* at 167). He testified at trial that he swabbed Mr. Wentland's mouth for DNA after he was advised he could refuse to provide his DNA. (*Id.* at 168). Officer Tyler explained that he then executed the search warrant finding and securing two firearms. In the front passenger door, he found the firearm that Officer Ruszkowski had seen. (Gov. Tr. Exh. 5). In the back seat area, he found a second Glock handgun with a switch attached under the driver's seat. (Gov. Tr. Exh. 6). When asked if he had run any firearm traces on the guns he found in the Jeep to identify their original purchasers, Officer Tyler explained that he was not responsible for traces and that another investigator would have performed that task. (*Id.* at 197–98).

In the meantime, Mr. Wentland was advised of his *Miranda* rights before he agreed to speak with police. Mr. Wentland was taken to the police department where he was interviewed by an officer assigned to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Task Force. A video of part of the interview was played for the jury at the trial. (Gov. Tr. Exh. 9). The interviewing Task Force Officer, Bayne Bennett, testified that at the time of the interview, he was only aware of one Glock being found in the Jeep—the firearm found in the passenger door. (ECF 94 at 54). The interview video showed Mr. Wentland describing his activities that night to TFO Bennett. Mr. Wentland said he had been out that night with a very good friend that he referred to as his "cousin," and who he identified as "Desmond Bane," along with his blood cousin who was the juvenile found in the Jeep with him. (Gov. Tr. Exh. 9). Mr. Wentland told the officer that the gun in the passenger door belonged to Desmond who had shown it to him before the police arrived that night. According to Mr. Wentland, he touched the

gun while "checking it out" but that he had never seen a switch before. He said that Desmond told him there was a switch on the gun. When TFO Bennett asked Mr. Wentland if he knew what a switch was, he initially said he did not but went on to tell TFO Bennett that he thought a switch makes a gun fully automatic. Mr. Wentland claimed no knowledge of how the gun got into the passenger door of the Jeep, which he believed to be Desmond's car.

At trial, four Government witnesses testified regarding evidentiary analyses conducted on the guns. Sierra Halstead of the South Bend Police Department crime lab testified that she received Mr. Wentland's DNA swabs and the two firearms, swabbed the two guns for DNA and fingerprints, and sent all the DNA samples to the Indiana State Police ("ISP") Laboratory for further testing. (ECF 84 at 205–10). Kimberly Anderson of the ISP Lab testified that she received the DNA samples and analyzed them. She reported finding "moderate support" that Mr. Wentland contributed DNA to the back of the grips and the bottom of the magazine of the gun in the passenger door and "strong support" that he contributed DNA to the mixture on the front sight while excluding him as a contributor to the gun's trigger and switch. (ECF 94 at 23–27). She also reported finding "very strong support" that Mr. Wentland was a DNA contributor to the back of the grips, the front sight, the bottom of the magazine, the switch, and the laser buttons on the gun found under the driver's seat. (*Id.* at 28–32).

The Government also introduced both guns as exhibits. The gun found in the passenger door was a Glock 20 with a switch admitted as Exhibit 5. (ECF 84 at 178–79). The gun found under the driver's seat was a Glock 19 with a switch admitted as Exhibit

6

6. (*Id.* at 181–82). Ronald Wilson of the South Bend Police Department ballistics lab test-fired the Glock 19 and testified about the results. He reported that with the switch to the right, it fired fully automatic, but with the switch to the left, it fired semiautomatic. (*Id.* at 226). Ronald Kaszus of the South Bend Police Department firearms lab test-fired the Glock 20. He testified that the gun fired automatically regardless of whether the switch was flipped to the left or the right. (*Id.* at 234). Officer Kaszus explained that this is a common malfunction of switches. (*Id.*).

The Government elicited no testimony about firearms traces from Officers Wilson or Kaszus. On the second, and last, day of trial, however, the Government asked ATF TFO Bennett about firearms traces generally and then about traces for this case. (ECF 94 at 58). TFO Bennett testified that he had not conducted traces on either firearm but that traces had been conducted. Defense trial counsel objected because she had never received any firearms traces during discovery. After some conversation with the Court and some additional review of its discovery files, the Government attorney provided Mr. Wentland's trial counsel with the reports of the firearms traces and admitted that the traces had not been produced to Mr. Wentland's trial counsel before the last day of trial. (*Id.* at 64). Mr. Wentland, through counsel, moved for a mistrial arguing that the Government failed to comply with its disclosure requirements under Fed. R. Crim. P. 16 and *Brady v. Maryland*.

Over Mr. Wentland's objections, TFO Bennett was allowed to testify about the traces. On cross-examination, TFO Bennett revealed that Ron Wilson of the SBPD ran the traces on the two guns. (*Id.* at 71). TFO Bennett also testified that once the guns came

into ATF custody, they were sent to the ATF Firearms and Technology Branch to be examined to determine what the guns were—in other words, if the guns were machineguns. (*Id*. at 74–75). The defense had not heard about the ATF examiner's testing of the guns before TFO Bennett's testimony either. As directed by the Court, the Government located the ATF Report during the jury's lunch break that day and delivered it to defense counsel. The Report, attached to Mr. Wentland's instant motion, shows that TFO Bennett sent the guns for testing in July 2024 and a firearms enforcement officer named Cody Toy signed the final Report in September 2024. (*Id*. at 81–82; ECF 109 at 37–44). The late production led defense counsel to ask a second time for a mistrial. The request was denied but the Court invited a Rule 33 motion for a new trial to address any concerns about the Government's compliance with its discovery obligations. (ECF 94 at 82).

At the close of the Government's evidence, Mr. Wentland, through counsel, moved for a judgment of acquittal under Fed. R. Crim. P. 29 alleging an insufficiency of evidence from the Government to prove that the firearms were machineguns and that Mr. Wentland knew the firearms were machineguns when he possessed them. The motion was denied, and the jury returned a guilty verdict.

### D.    Post-Trial

On February 11, 2026, the Government supplemented the trial record by filing a Notice Regarding Examination of Firearms updating the Court on the production of the ATF Report regarding the two guns at issue in Mr. Wentland's case. (ECF 82). The Government attorney explained that during trial, he checked the computer files holding

investigative materials for this case and inventory lists of materials provided to the defense in discovery. No ATF reports were in the Government's computer files and nothing revealed that the Government had produced the ATF Report to the defense during discovery. TFO Bennett then obtained a copy of the ATF Report, which was provided to Mr. Wentland's trial counsel before the close of evidence.

After the trial, the Government attorneys discussed these matters further and located email records showing that TFO Bennett had provided the ATF Report to one of the Government's trial attorneys via email in September 2024. (*Id*. at 3). The attorney did not recall opening or reading the 26-page ATF Report. But records show that he emailed the ATF Report and a CV to Mr. Wentland's first lawyer on September 25, 2024, as she was counsel of record at that time. (*Id*.). Despite this email trail, the Government reported that the ATF Report was inadvertently omitted from the Government's case file and was not logged or labeled for formal discovery procedures. As a result, the Government inadvertently omitted the ATF Report when delivering a copy of the discovery materials to Mr. Wentland's second lawyer. As a result, Mr. Wentland's trial lawyer received the ATF Report for the first time on the last day of trial along with the firearm traces.

Mr. Wentland's trial counsel and a defense investigator from the South Bend branch of the Federal Community Defenders in the Northern District of Indiana used the firearm traces to investigate the provenance of the guns. The trace for the Glock 19 showed that it was purchased in 1999 by a person with the initials R.K. Trial counsel

9

learned that R.K. passed away on April 23, 2023, and initiated contact with his next of kin to ask about the disposal of the gun after R.K.'s death. She got no response.

The Glock 20 trace showed that it was purchased in 2018 by an individual with the initials T.S. On March 2, 2026, trial counsel and the investigator traveled to T.S.'s residence but did not find him. Trial counsel sent a letter to T.S. on March 6, 2026, asking for a response regarding the Glock 20's history. T.S. never responded, but trial counsel received a phone call from someone claiming to hold a power of attorney for T.S. who evidently faced a charge for straw purchasing firearms. With this information, trial counsel realized she had a conflict of interest because her office represented T.S. on a straw purchasing charge and withdrew from Mr. Wentland's case. A third lawyer was appointed for Mr. Wentland, but no further information about the history of either Glock was found.

On April 27, 2026, Mr. Wentland, through his third lawyer, filed his Combined, Renewed Motions for a Judgment of Acquittal or a New Trial, which have been fully briefed. Mr. Wentland attached five exhibits to his motion including Exhibit A, the June 9, 2025, letter from Mr. Wentland's trial counsel asking the Government to produce the discovery file (ECF 109 at 32–35); Exhibit B, the ATF Report of Technical Information by examiner Cody Toy dated September 20, 2024, and the related Transmittal Form from TFO Bennett dated July 16, 2024 (*Id*. at 37–67); Exhibit C, the Firearms Trace Summaries for the Glock 20 and Glock 19 completed on February 15, 2024, and requested by Ronald Wilson (*Id*. at 69–70); Exhibit D, the Indiana Certificate of Death for R.K., the original purchaser of the Glock 19 (*Id*. at 72); Exhibit E, the defense investigator's memo dated

March 11, 2026, regarding his site visit on March 2, 2026, with Mr. Wentland's trial counsel to the home of T.S., the original purchaser of the Glock 20 (*Id*. at 74–75); and Exhibit F, Mr. Wentland's trial counsel's letter to T.S. dated March 6, 2026, asking him to contact her about his purchase of the Glock 20 (*Id*. at 78–79) and the unsigned declaration of the investigator dated April 28, 2026, describing his post-trial investigative efforts on behalf of Mr. Wentland (*Id*. at 81–82).

## II.   ANALYSIS

### A.   Renewed Rule 29 Motion for Judgment of Acquittal

Through his renewed Rule 29 motion for judgment of acquittal, Mr. Wentland challenges the sufficiency of evidence at trial to find him guilty of possessing a machinegun in violation of 18 U.S.C. § 922(o). To obtain a conviction, the Government had to prove the following three elements:

1) Mr. Wentland knowingly possessed a firearm;

2) The firearm was a machinegun; and

3) Mr. Wentland was aware of the essential characteristics of the firearm that made it a "machinegun" at the time of possession.

Final Jury Instruction No. 11 advised the jury that each of these elements had to be proven beyond a reasonable doubt to support a guilty verdict. (ECF 69 at 12). Jury Instruction No. 12 provided the jury with the statutory definition of "machinegun" directly from 26 U.S.C. § 5845(b). (*Id*. at 13). Additional jury instructions defined the critical terms "possession" and "knowingly" to assist the jury in their deliberations. (*Id*. at 14–15). Mr. Wentland now argues that the Government failed to meet its burden of

proof as to whether the firearms in this case constituted machineguns under 26 U.S.C. § 5845(b) and whether Mr. Wentland knew the firearms were machineguns at the time he possessed them.

In deciding both Rule 29 motions for acquittal and Rule 33 motions for a new trial, the evidence at trial is considered in the light most favorable to the Government with all reasonable inferences drawn in its favor. *United States v. Fitzpatrick*, 32 F.4th 644, 648–49 (7th Cir. 2022); *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021); *United States v. Alanis*, 265 F.3d 576, 591 (7th Cir. 2001). Convictions are overturned only if the court determines that "no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Anderson*, 988 F.3d at 424 (citing *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020)). A Rule 29 motion is granted only if the record is devoid of evidence from which a jury could find guilt. *See United States v. Jackson*, 5 F.4th 676, 682–83 (7th Cir. 2021).This burden is described as "nearly insurmountable." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (quoting *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011)).

### 1.    Firearms as Machineguns

Jury Instruction No. 12 quoted the statutory definition of "machinegun" found in 26 U.S.C. § 5845(b) as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.
> The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a

12

weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

ECF 69 at 13.[1] Mr. Wentland and the Government agree that this is the proper definition of "machinegun" but interpret the requirements for establishing that a firearm is a machinegun differently.

According to the Government, the first sentence of Section 5845(b) qualifies a firearm as a "machinegun" solely on the automatic firing feature or whether the weapon "shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." The Government acknowledges that automatic firing is not the only characteristic that could make a firearm a machinegun under the statute. Parts or combination of parts "designed and intended solely and exclusively" to convert a weapon into a machinegun, or any combination of parts that can be assembled into an automatic firing weapon, could also qualify a firearm as a "machinegun" under the second sentence of Section 5845(b). Thus, the Government views the statute as disjunctive, providing alternative methods for determining whether a weapon, parts, or combination of parts qualify as a "machinegun." The Government's view of options under Section 5845(b) comports with the Seventh's Circuit's description of the term "machinegun" as "either a weapon that fires repeatedly on a single trigger pull or as a part or parts designed to

---

[1] The two sentences of the Section 5845(b) statutory definition are incorporated into a single paragraph. Yet the parties did not object to the formatting of the two sentences into two paragraphs in Jury Instruction No. 12. (ECF 94 at 90).

13

convert a manually firing weapon into a machine gun." *United States v. Kenney*, 91 F.3d 884, 885 (7th Cir. 1996). From this perspective, the Government argues that the jury reasonably found that the two firearms at issue in this case were machineguns because trial testimony showed that they were each tested by the South Bend Police Department and they both shot "automatically more than one shot" during the tests.

Mr. Wentland, on the other hand, seems to interpret Section 5845(b)'s definition of "machinegun" differently. He argues that the Government was required to prove that "any part" that enables a weapon to shoot "automatically more than one shot" was "designed and intended solely and exclusively" to make the weapon into a machinegun as referenced in the second sentence of the statute. Mr. Wentland contends that the Government did not meet its burden simply with evidence that the firearms at issue shot "automatically more than one shot." He suggests that the two firearms were not machineguns without the attached switches. As a result, he maintains that both guns, with their attached switches, must be considered a "combination of parts" and must be "designed and intended solely and exclusively" for use in converting a weapon into a machinegun to qualify as a "machinegun" under Section 5845(b).

As Mr. Wentland states, no testimony or evidence as to whether the guns and switches in the Jeep were designed for use in converting a weapon into a machinegun was presented at trial. Mr. Wentland stresses that the switches were intentionally designed for both semiautomatic and fully automatic firing depending on the choice of the user. Thus, he concludes that the switches did not convert a semiautomatic weapon into an "exclusively" fully-automatic weapon and could not have been intended for that

14

sole purpose as required by the second sentence of Section 5845(b). Mr. Wentland omits any legal authority to support this interpretation of the statute when applied to handguns with switches attached. Nor does he address the range of cases cited by the Government finding handguns with switches attached to be "machineguns" under the statute.

Switches are "auto sears" that "permit[] a shooter to fire multiple shots while engaging the trigger only once." *Garland v. Cargill*, 602 U.S. 406, 420 n.4 (2024); *see also United States v. Moore*, CRIMINAL ACTION NO. 3:24-CR-97-KHJ-LGI-1, 2025 WL 1001345, at *1 n.1 (S.D. Miss. Apr. 3, 2025) (defining the colloquial terms "Glock switches" or "buttons" as "[a]uto sears designed for Glock handguns"). The ATF has "recognized that modifying a semiautomatic rifle or handgun with an auto sear converts it into a machinegun." *Garland*, 602 U.S. at 420 n.4 (citing ATF Ruling 81-4). Similarly, the Seventh Circuit found that the Sentencing Guidelines enhancement for a defendant whose offense involved a machinegun as defined in Section 5845 applied because a switch was attached to a "conventional semi-automatic Glock pistol [allowing it] to function as a fully automatic firearm." *United States v. Brooks*, 100 F.4th 825, 839 (7th Cir. 2024); *see also United States v. Williams*, No. 4:25-CR-5, 2025 WL 2394551, at *5 (S.D. Ga. Aug. 18, 2025), *report and recommendation adopted,* No. 4:25-CR-5, 2025 WL 2886304 (S.D. Ga. Oct. 10, 2025) ("A firearm modified with a 'Glock switch' constitutes a machinegun."). The District of Kansas also found that "a device is a 'machinegun' if, for example, it fires more than one shot by a single function of the trigger" as a matter of law. *United States v. Isaac*, Case No. 23-20050-01-DDC, 2025 WL 1755134, at *14 (D.

Kansas June 25, 2025). The court held that "to secure a conviction, the government needn't prove *also* that the device was converted into a machinegun by a part 'designed and intended solely and exclusively' for that purpose." *Id.* (emphasis in original) (interpreting Section 5845(b) as "establishing independently sufficient definitions of 'machinegun' by use of phrase 'term shall also include'").

Consistent with this authority, the Glock handguns at issue in Mr. Wentland's case are machineguns because the switches attached to them converted them into weapons that shot, or could be readily restored to shoot, more than one shot automatically by a single function of the trigger. Mr. Wilson's and Mr. Kaszus's testimony at trial both support this conclusion. Mr. Wilson test-fired the Glock 19 found under the driver's seat in the Jeep. (ECF 84 at 226). He testified that during the test, the Glock 19 fired "full automatic" when the switch was flipped to the right and "semiautomatic" when the switch was flipped to the left. (*Id.*). While the Glock 19 with the switch attached did not shoot fully automatic in all instances during Mr. Wilson's test, it could be readily restored to shoot fully automatic from semiautomatic mode by flipping the switch to the right.

Mr. Kaszus then testified about test-firing the Glock 20. (*Id.* at 233). During his test, the Glock 20 fired fully automatic when the switch was flipped both left and right. (*Id.* at 234). Mr. Kaszus explained that the Glock 20 fired only automatically, not semiautomatically, because of a defect in the switch, which is a common result when test-firing guns with switches. (*Id.* at 234–35). Mr. Kaszus's testimony implied that the

16

Glock 20 with the switch attached was not designed to shoot fully automatic all the time, but it did shoot fully automatic all the time because of the defect in the switch.

This testimony was sufficient to support a jury conclusion that both the Glock 19 and the Glock 20 constituted machineguns without any need for evidence that the switches themselves or the handguns with the switches attached were "designed and intended solely and exclusively, for use in converting a weapon into a machinegun." As a result, Mr. Wentland has not shown that no rational trier of fact could have found this essential element of Mr. Wentland's alleged offense—that the firearms were "machineguns" under 26 U.S.C. § 5845(b)—beyond a reasonable doubt. *See Anderson*, 988 F.3d at 424; *Grayson Enters.*, 950 F.3d at 405. As both the firearms constituted machineguns, Mr. Wentland's additional argument under *Yates v. United States*, 354 U.S. 298, 312 (1957) and *United States v. Demus*, 167 F.4th 980, 983 (7th Cir. 2026) that the jury's verdict should be set aside because it may have been based on a "legally inadequate" theory of what constitutes a "machinegun" need not be addressed.[2]

### 2. Knowledge that Firearms Were Machineguns

Mr. Wentland also argues that the Government submitted insufficient evidence to the jury to establish beyond a reasonable doubt that Mr. Wentland knew the firearms at issue were machineguns at the time he possessed them. As the jury instructions advised, "[a] person acts 'knowingly' if he realizes what he is doing and is aware of the

---

[2] Based on his unpersuasive interpretation of the definition of "machinegun," Mr. Wentland argued that a conviction based on the Glock with the functioning switch that did not always shoot fully automatic would have resulted from a "legally inadequate" prosecution theory and should be set aside. (ECF 109 at 12–13 (citing *Yates*, 354 U.S. at 312 (holding that a verdict must be set aside when it "is supportable on one [legal] ground, but not on another, and it is impossible to tell which ground the jury selected")).

nature of his conduct, and does not act through ignorance, mistake, or accident." (ECF 69 at 15). The jury was also advised that "[i]n deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said." (*Id.*). This instruction is consistent with the Supreme Court's holding that "knowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994). As an example of an appropriate inference from circumstantial evidence, the Court noted that "firing a fully automatic weapon would make the regulated characteristics of the weapon immediately apparent to its owner." *Id.*

According to the defense, the only evidence of knowledge in the trial record came from TFO Bennett's answers on cross-examination regarding what Mr. Wentland told him during the interview at the police station. TFO Bennett affirmed that Mr. Wentland said that "he had never seen a switch before" and that "he did not know what a switch was until someone told him what it was." (ECF 94 at 76). As the defense states, no evidence that Mr. Wentland ever fired a Glock firearm with a switch attached, or any machinegun, was admitted at trial. The defense also contends that no temporal evidence was presented as to whether Mr. Wentland knew the handgun was equipped with a switch when he handled it; or when he learned the switch was attached to the handgun; or when he learned what a switch did. Indeed, TFO Bennett never asked Mr. Wentland if he knew the gun was a machinegun when he was handling it. On this record, Mr. Wentland argues that the Government has not met its burden to show that Mr. Wentland "was aware of the essential characteristics of the firearm that made it a

18

'machinegun' at the time" he possessed it. (ECF 109 at 13; *see also* ECF 69 at 12 (Jury Instruction No. 11)).

In response, the Government relies on the DNA evidence showing "moderate" to "strong support" that Mr. Wentland contributed to the DNA mixtures found on the Glock 20 (passenger door) and "very strong support" for his DNA contribution to the Glock 19 (driver's seat). The Government also emphasizes that during Mr. Wentland's interview, Mr. Wentland discussed the Glock found in the passenger door[3] with TFO Bennett and admitted having touched it, described it as having a switch on it, and saying he had been "checking it out." The Government also highlighted that the switches were externally visible on both guns, which were found with high-capacity magazines, and that the jurors were allowed to examine the guns during trial.

And lastly, the Government contends that the evidence presented at trial reveals Mr. Wentland's consciousness of his guilt. Mr. Wentland has not disputed that he gave Officer DeLee a fake name and date of birth at the scene or that he fled the scene when Officer Ruskowski found the gun in the passenger door. TFO Bennett also testified that he unsuccessfully tried to find Desmond Bane through searches of the Elkhart Police and South Bend Police databases and that the first return on a Google search of "Desmond Bane" was an NBA basketball player. (ECF 94 at 56–57). The Government

---

[3] Mr. Wentland referenced the "black Glock" in the interview. During closing argument, Mr. Wentland's trial counsel urged the jury to review the interview video suggesting that Mr. Wentland's reference to the "black Glock" may have been a reference to the gun found under the driver's seat. (ECF 94 at 113–14). While the Court cannot know how the jury weighed the video in its deliberations, the Court's own review of the video shows that TFO Bennett asked Mr. Wentland about the passenger door Glock. Additionally, TFO Bennett testified that at the time of the interview, he was only aware of the passenger door Glock.

hypothesizes that Mr. Wentland used the name "Desmond Bane" to deflect blame away from himself. From this circumstantial evidence, the Government argues that the jury could reasonably and properly infer that Mr. Wentland knew the guns in the Jeep had the essential characteristics of a machinegun at the time he possessed them. Other courts have found circumstantial evidence of this quality and quantity sufficient to sustain a conviction for unlawful possession of a machinegun. *United States v. Jacobs*, Case No. 4:24-cr-00009-001, 2025 WL 2694850, at *5–*8 (W.D. Va. Sept. 22, 2025) (comparing the facts in *Jacobs* to cases in the First Circuit affirming convictions after considering circumstantial evidence in light of *Staples*).

While not mentioned by either party, the interview video presented to the jury includes additional circumstantial evidence relevant to the temporal element of Mr. Wentland's knowledge as well. By answering TFO Bennett's questions, Mr. Wentland created a timeline. He explained that he discussed the "black Glock" with Desmond Bane before the police arrived and that Desmond told him that a switch was attached to the gun during that conversation. And while at first, Mr. Wentland told TFO Bennett he did not know what a switch was, he immediately articulated in his own words, without help from TFO Bennett, that a switch makes a gun "fully automatic" — the essential characteristic of a machinegun in the statutory definition in 26 U.S.C. § 5845(b). Therefore, the Government did present evidence at trial from which a "rational" jury could find beyond a reasonable doubt that Mr. Wentland knew the firearms he possessed had the essential characteristics of a machinegun at the time he possessed it. *See Anderson*, 988 F.3d at 424; *Grayson Enters.*, 950 F.3d at 405.

Mr. Wentland also asks the Court to enter a judgment of acquittal because the Government did not disclose the firearms traces until the last day of trial. As Mr. Wentland's motion suggests, the traces showed that Mr. Wentland was not the original purchaser of either gun. (*See* ECF 109 at 68—69). That evidence might have supported an inference that he was less likely to know the features of the firearms and any modifications to them, such as the addition of an aftermarket switch, so long as Mr. Wentland never owned the gun himself. Yet, the traces alone did not, and could not, establish whether Mr. Wentland, or Desmond Bane for that matter, ever owned the guns. Mr. Wentland's trial counsel tried to trace the guns' ownership histories but could only identify the original purchasers—from eight and 27 years ago respectively—with no further confirmation of ownership since then. Without more, the evidentiary weight that could be attributed to the traces is extremely limited, so limited in fact, as not to be material to Mr. Wentland's knowledge of the firearms' characteristics.

As a result, with all reasonable inferences drawn in the Government's favor, Mr. Wentland has not established that the record at trial was devoid of evidence from which the jury could have found Mr. Wentland guilty of unlawfully possessing a machinegun in violation of 18 U.S.C. § 922(o). *See Fitzpatrick*, 32 F.4th at 648–49; *Jackson*, 5 F.4th at 682–83; *Anderson*, 988 F.3d at 424; *Grayson Enters.*, 950 F.3d at 405. Accordingly, Mr. Wentland's renewed Rule 29 motion for judgment of acquittal is denied. (ECF 109).

**B.    Rule 33 Motion for New Trial**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a) "Courts have

interpreted Rule 33 to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). Granting a motion for a new trial "is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016); *see also United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (noting that the courts approach motions for new trial with great caution and are wary of second-guessing jury determinations). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990), *amended on other grounds*, 910 F.2d 467 (7th Cir. 1990)).

"The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713–14 (7th Cir. 2020) (quoting *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015)). The Court should only grant a new trial if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original) (citation omitted), or "if there is a reasonable possibility that [a] trial error had a prejudicial effect on the jury's verdict," *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). Here, Mr. Wentland seeks a new trial on grounds that the Government violated its obligations under *Brady v. Maryland* and Fed. R. Crim. P. 16.

22

### 1.    *Brady* Violation

The Government violates a criminal defendant's Fifth Amendment due process rights by failing to disclose exculpatory evidence, or "evidence . . . material either to guilt or to punishment," when requested by the defendant "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also United States v. Fallon*, 348 F.3d 248,251 (7th Cir. 2003). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

"To establish a *Brady* violation, the defendant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." *United States v. Roberts,* 534 F.3d 560, 572 (7th Cir. 2008) (citing *United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006). There is no *Brady* violation unless "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Baker*, 453 F.3d at 422. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The *Brady* disclosure duty extends to information known to members of the prosecution team, including investigating

23

police officers and agents, even if unknown to the prosecutor himself. *See id.* at 437 (holding that prosecutors have "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police").

Mr. Wentland argues that all the elements of a *Brady* claim exist here based on the Government's late disclosure of the firearm traces and the ATF Report on the last day of trial, just minutes before the close of evidence. First, no one disputes that the Government did not disclose the firearm traces and the ATF Report to Mr. Wentland's trial counsel until after almost all key witnesses had testified at trial. At trial, the Government admitted that TFO Bennett had access to the firearm traces, but they were not produced in discovery to the defense. (ECF 94 at 64). In the Government's post-trial notice, the prosecutor confirmed that he had sent the ATF Report to Mr. Wentland's first lawyer by email on September 25, 2024, but inadvertently failed to include the Report in the copy of the discovery file sent to Mr. Wentland's trial counsel in June 2025 upon her request. (ECF 82).

While the suppression element is not disputed, neither party has addressed whether the Government met its obligation to produce the ATF Report to the defense by producing it to Mr. Wentland's first lawyer regardless of whether it was included in the Government's subsequent production to Mr. Wentland's trial counsel. Similarly, neither party has discussed whether Mr. Wentland's first lawyer had any obligation to deliver Mr. Wentland's discovery file to trial counsel after her representation of Mr. Wentland was terminated. After all, Indiana Rule of Professional Conduct 1.16(d) provides that "[u]pon termination of representation, a lawyer shall take steps to the

extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . ." In a footnote, Mr. Wentland merely represents that his trial counsel "avers that she had a good-faith belief that [requesting the records from his first lawyer] would have been pointless." (ECF 109 at 18 n.3). With that said, the question of whether the Government or defense attorneys breached their duty of production need not be developed further or resolved now as the suppression element will not be determinative of Mr. Wentland's *Brady* claim.

To show favorability, "[e]vidence need only have 'some weight' or 'tendency' to be favorable to the defendant." *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018) (quoting *Kyles*, 514 U.S. at 451). The firearms traces could be viewed as slightly favorable to Mr. Wentland because they show that he did not purchase either gun originally and would not know the original features of the guns to recognize any modifications to the guns when he possessed them in February 2024.[4] Mr. Wentland argues that the ATF Report is exculpatory and favorable to him emphasizing the function tests in the Report. The Report states that Officer Toy tested both guns twice, and both guns only fired semiautomatic during their first tests but then fired fully automatic during their second tests. (ECF 109 at 40–42). The Report attributes the first

---

[4] The trial transcript shows that Mr. Wentland's trial lawyer raised a different theory regarding the relevance of the firearms traces. During a sidebar discussing the previously undisclosed firearms traces, she focused on the evidence of multiple DNA contributors to the firearms and told the Court:

> "It matters to me who the original purchase of this firearm was to explain why there's multiple contributors of DNA, when did Octavius Wentland touch it, did he touch one, did he touch two, how did he come into possession of it." (ECF 94 at 68).

The briefing of Mr. Wentland's instant motions for acquittal or a new trial (ECF 109) does not develop this theory in the analysis of the relevance, favorability, or materiality of the firearms traces. Therefore, any related argument need not be addressed here.

semiautomatic test results to damage to "the leg" of the switch. (*Id.*). Based on the semiautomatic tests, Mr. Wentland suggests the Report could create reasonable doubt as to whether the firearms met the statutory definition of a "machinegun," regardless of the subsequent fully automatic tests. As already discussed, however, a firearm is a "machinegun" under 26 U.S.C. § 5845(b) if it "shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." The ATF Report shows that both firearms actually shot fully automatic and that even when they didn't in the first round of tests, they were sufficiently restored to shoot automatically in the second round of tests. Thus, both the firearms traces' and the ATF Report's favorability to Mr. Wentland would be minimal at best.

To establish that he was prejudiced by the Government's suppression of the firearms traces and the ATF Report, Mr. Wentland does not have to show that he would have been acquitted but for the Government's suppression. Rather, he only needs to show that the Government's failure to disclose the favorable evidence created a "reasonable probability of a different result [by] undermin[ing] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). The limited favorability of the firearms traces and the ATF Report do not show that they could reasonably be taken, when considered along with all the evidence presented at trial, "to put the whole case in such a different light as to undermine confidence in the verdict." *See id.* at 435. Therefore, Mr. Wentland has not established the prejudice required to succeed on his *Brady* claim.

Accordingly, Mr. Wentland's motion for a new trial on grounds of a *Brady* violation will be denied.

### 2.     Discovery Violations

Lastly, Mr. Wentland argues that a new trial is also warranted based on the Government's failure to disclose the firearm traces and the ATF Report during the discovery period as required by Fed. R. Crim. P. 16(a)(1)(F) and the Court's Discovery Order. Rule 16(a)(1)(F) provides that:

> (F) *Reports of Examinations and Tests*. Upon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any physical or mental examination and of any scientific test or experiment if:
>
>> (i) the item is within the government's possession, custody, or control;
>>
>> (ii) the attorney for the government knows — or through due diligence could know — that the item exists; and
>>
>> (iii) the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

When this rule is violated, the Court may "enter any . . . order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D). "[A] new trial is warranted only after all other, less drastic remedies are inadequate." *United States v. De La Rosa*, 196 F.3d 712, 715 (7th Cir. 1999).

No one disputes that the firearms traces and the ATF Report were within the Government's possession, custody, or control, and the Government's attorney knew or could have known that they existed. At the same time, the Government has stated that it never intended to use the traces or the Report in its case-in-chief at trial. And Mr.

Wentland's assertion that the items were material to preparation of his defense are overcome by the weight of the totality of the evidence against him. There is no reason to doubt that in preparing Mr. Wentland's defense, trial counsel would have investigated the ownership history of the guns if she had received the firearms traces or that she would have prepared more questions for TFO Bennett regarding the semiautomatic tests of the guns reflected in the ATF Report. She may have even modified her opening statement and closing argument. Yet for all the reasons already discussed, Mr. Wentland has not shown that any of this evidence was reasonably likely to have changed the outcome of this trial. Therefore, a new trial based on a Rule 16 violation would not be just under the totality of the circumstances in this case.

Similarly, any failure to comply with the deadline for Rule 16 disclosures set in the Court's Discovery Order does not warrant a new trial in this case as Mr. Wentland has not shown that he was not provided with a fair trial. *See United States v. Cruz-Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) ("A new trial is warranted for a discovery violation only if the remedy offered by the district court was inadequate to provide the defendant with a fair trial." (internal quotations omitted)). At trial, the Court immediately offered remedies to Mr. Wentland for the Government's untimely disclosures. The Government was ordered to locate and produce the firearm traces within 20 minutes, which it did. (ECF 94 at 62, 64). The Court also shortened the lawyers' lunch break on the last day of trial for TFO Bennett to go to his office and retrieve the ATF Report so the Government could produce it to Mr. Wentland's trial lawyer as soon as possible after its nondisclosure was discovered. (*Id.* at 80–81). Once

28

Mr. Wentland's lawyer had received both the firearms traces and the ATF Report, the Court asked Mr. Wentland's lawyer how much time she needed to review the ATF Report and consider its effect on jury instructions and closing arguments. (*Id*. at 83–84). Counsel asked for no more than 10 minutes, yet the Court explicitly gave her more time totaling almost 25 minutes. (*Id*. at 84). The Court provided adequate remedies to facilitate a fair trial for Mr. Wentland in the face of the discovery disclosure issues that surfaced on the last day of trial. No further remedies are required.

With that said, Rule 16 and the Court's discovery orders are not mere suggestions for what or when discovery should be disclosed. The parties are advised that appropriate sanctions will be imposed for noncompliance in discovery when necessary to protect a criminal defendant's rights. The only plausible sanction in this case would be a new trial given the timing of the disclosures, but Mr. Wentland's rights were not compromised in a material way to justify such an extreme sanction.

Accordingly, Mr. Wentland's motion for a new trial on grounds of Rule 16 and Discovery Order violations will be denied.

## III.    CONCLUSION

For the reasons discussed above, Mr. Wentland's Combined, Renewed Motions for a Judgment of Acquittal or a New Trial are **DENIED**. (ECF 109). A sentencing hearing and a deadline for sentencing memoranda will be scheduled by separate order.

SO ORDERED on July 20, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT